

10-CV-05805-AF

FILED _____ LODGED
_____ RECEIVED

JAN 0 7 2011

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

3
4
5
6
7

# THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT TACOMA

8
9

| | |
|---|---|
| RENE L. LARSON AND JERROLD A. LARSON,<br>    Plaintiffs,<br><br>    v.<br><br>WELLS FARGO BANK, NA<br>    Defendant. | No. 3:10-cv-05805-RBL<br><br>AFFIDAVIT OF RENE L. LARSON<br>IN SUPPORT OF<br>SUSPICIOUS ACTIVITY REPORT<br>(Securities Fraud)<br><br>**\*Clerk's Action Required** |

10
11
12
13
14
15

Before me, the undersigned Notary, personally appeared the Plaintiff, RENE L. LARSON, who being

by me duly sworn, deposes and says that my name is Rene Lynn Larson (hereinafter "Affiant"), I

am of sound mind, lawful age and capable of making this Affidavit and the statements set forth in

this Affidavit as true, correct and completely based upon my own firsthand knowledge under penalty

of perjury under the laws of the state of Washington and the united States of America:

1. Affiant understands, if Affiant becomes a witness to a crime, the Affiant must report the

    crime or become an accomplice to it; and, the same laws and principles apply to any Officer

    of the Court in receipt of Affiants report/affidavit; and,

2. Affiant understands a Mortgage Note is transferred by endorsement; and,

AFFIDAVIT OF
RENE L. LARSON

Page 1 of 6

**Rene and Jerrold Larson, Plaintiff(s)**
**532 E. Stonecreek Dr.**
**La Center, WA 98629**

3. Affiant understands a Deed of Trust is transferred by publicly recorded assignment; and,

4. Affiant was enticed through Predatory Lending Practices, violations of the Truth in Lending Act (TILA), and violations of Real Estate Settlement Procedures Act (RESPA) in obtaining a loan and making a Mortgage Note secured by a Deed of Trust (3792519) as evidenced by independent Forensic Audit commissioned by Affiant (attached as Exhibit "A"); and,

5. Affiant understands Affiant's above said Mortgage Note was irrevocably severed and unsecured from Affiant's above said Deed of Trust (3792519); and,

6. Only the Mortgage Note was transferred to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 on or before October 8, 2005, without Assignment of the above said Deed of Trust (3792519) as evidenced by independent Securitization Audit (attached as Exhibit "B") commissioned by the Affiant which located the related Loan No. 0024229429 in WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2; and,

7. Affiant understands WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 is a Real Estate Mortgage Investment Conduit (REMIC) which issued mortgage back securities, Series 2005-2; and,

8. Affiant understands Affiant's Mortgage Note became irretrievable once it was transferred to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 because securities backed by the Mortgage Note were issued; and,

9. Affiant understands the act of making Affiant's Mortgage Note irretrievable, even when paid in full, breached 'Paragraph 29. Reconveyance' of the said Deed of Trust which requires the return of Affiant's Mortgage Note; and,

AFFIDAVIT OF
RENE L. LARSON

**Rene and Jerrold Larson, Plaintiff(s)**
**532 E. Stonecreek Dr.**
**La Center, WA 98629**

Page 2 of 6

10. The lender's claim on the subject property/collateral is forfeited accordingly; and,

11. Affiant understands Affiant's said Deed of Trust (3792519) was never transferred by assignment to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 ; and,

12. Affiant understands mortgage backed securities where issued based upon the said Deed of Trust/Mortgage (3792519) being assigned to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2;

13. Affiant understands that issuing securities labeled 'mortgage backed' which are, in fact, unsecured and not mortgage backed at the time of issue is securities fraud and is a criminal activity; and,

14. Auditor's public records for Clark County, Washington shows no assignment of the said Deed of Trust (3792519) ever issued to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2; and,

15. WELLS FARGO BANK, N.A. proceeded to unlawfully foreclose said Deed of Trust (3792519) (see "Notice of Default" attached Exhibit "C") without lawful ownership by Assignment of the said Deed of Trust and without lawful ownership by endorsement of the Mortgage Note; and,

16. WELLS FARGO BANK, N.A.'S unlawful foreclosure acts are extortive and demand investigation; and,

17. WELLS FARGO BANK, N.A lacks standing and ownership of the related Mortgage Note required to lawfully foreclose because the Mortgage Note is irrevocably severed from the related Deed of Trust (3792519); and,

AFFIDAVIT OF
RENE L. LARSON

**Rene and Jerrold Larson, Plaintiff(s)**
**532 E. Stonecreek Dr.**
**La Center, WA 98629**

Page 3 of 6

18. WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2, as Mortgage Note holder, lacks standing and backing of Deed of Trust (3792519) to lawfully foreclose because WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 doesn't lawfully own or hold it; and,

19. WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2, as Mortgage Note holder, lacks standing and backing of Deed of Trust (3792519) to issue mortgage backed securities based upon the fact Deed of Trust (2792519) related to Loan No. 0024229429 is not lawfully held by WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 and therefore can not be backing the issued mortgage-backed securities certificates of WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2; and,

20. Affiant believes WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 did, in fact, issue mortgage backed securities that are not backed by Deed of Trust/Mortgage (3792519); and,

21. Affiant believes the non-existence of an Assignment of Deed of Trust evidences the fact subject Deed of Trust (3792519) was never assigned to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 as per the requirements found in Section 2.01 (a) (ii) of the Pooling And Servicing Agreement for the REMIC known as WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 (restatement attached as Exhibit "D"; and,

AFFIDAVIT OF
RENE L. LARSON

Page 4 of 6

Rene and Jerrold Larson, Plaintiff(s)
532 E. Stonecreek Dr.
La Center, WA 98629

22. Affiant believes timely Assignment of the Deed of Trust (3792519) from WORLD SAVINGS BANK, FSB, (original Lender) to WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2 was required by law before mortgage backed securities could be lawfully issued; and

23. Affiant believes the above stated facts evidence mortgage backed securities fraud and requires a Suspicious Activity Report available from FinCen at the U.S. Department of Treasury (website) be issued by the Court for an investigation by the proper authorities;

Further your Affiant says naught at this time.

Affiant: RENE L. LARSON, Plaintiff

Signature: _Rene L. Lar_

### JURAT

I _MARK EATON_ a Notary Public certify that I know or have satisfactory evidence that Rene L. Larson appeared before me, and executed this Affidavit as her sworn statement as a free and voluntary act of her own will under penalty of perjury.

I certify under PENALTY OF PERJURY under the laws of the State of Washington, County of

_CLARK_ that the foregoing paragraph is true and correct.

_1 /6 / 11_
DATED:

_A_
Notary Public

My appointment expires _1 /9 / 12_

MARK W EATON
Notary Public
State of Washington
My Commission Expires
January 09, 2012

AFFIDAVIT OF
RENE L. LARSON

Page 5 of 6

**Rene and Jerrold Larson, Plaintiff(s)**
**532 E. Stonecreek Dr.**
**La Center, WA 98629**

# ATTACHED EXHIBITS

1. **Exhibit "A"**   Forensic Audit Report  w/ Affidavit in Support

2. **Exhibit "B"**   Securitization Audit Report  w/ Affidavit in Support

3. **Exhibit "C"**   NOTICE OF DEFAULT

4. **Exhibit "D" "Quoted from Pooling and Servicing Agreement for WELLS FARGO MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-2:**

Section 2.01 Conveyance of Mortgage Loans.

(a) The Seller, concurrently with the execution and delivery hereof,

(b) does hereby assign to the Trustee, without recourse all the right, title and interest of the Seller in and to (a) the Trust Estate, including all interest and principal received by the Seller on or with respect to each Mortgage Loan after the applicable Cut-Off Date (and including scheduled payments of principal and interest due after the applicable Cut-Off Date but received by the Seller on or before the applicable Cut-Off Date and Unscheduled Principal Receipts received or applied on the applicable Cut-Off Date, but not including payments of principal and interest due on the Mortgage Loans on or before the applicable Cut-Off Date), (b) the Insurance Policies, (c) the obligations of the Servicers under the Servicing Agreements with respect to the Mortgage Loans (including the right to receive any Servicer Prepayment Penalty Payment Amounts), (d) the right to receive, pursuant to the Mortgage Loan Purchase Agreement, any Originator Prepayment Penalty Payment Amounts and (e) proceeds of all the foregoing. It is agreed and understood by the Seller and the Trustee that it is not intended that any mortgage loan be included in the Trust Estate that is a "High-Cost Home Loan" as defined in any of (i) the New Jersey Home Ownership Act effective November 27, 2003, (ii) the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 or (iv) the Indiana Home Loan Practices Act, effective January 1, 2005.

In connection with such assignment, the Seller shall, with respect to each Mortgage Loan, deliver, or cause to be delivered, to the Custodian, on or before the Closing Date the following documents or instruments with respect to each Mortgage Loan.

(i) The original Mortgage Note either (A) endorsed in blank or (B) endorsed as provided in Section 2.01(d), with all prior and intervening     endorsements as may be necessary to show a complete chain of endorsements     or with respect to any Mortgage Loan as to which the original Mortgage Note has been permanently lost or destroyed and has not been replaced, a lost note affidavit with a copy of the Mortgage Note and, in the case of any Mortgage Loan originated in the State of New York documented by a NYCEMA, the NYCEMA, the new Mortgage Note, if applicable, the consolidated Mortgage Note and the consolidated Mortgage;

(ii) A recorded original assignment of the related Mortgage from Wells Fargo Bank assigning the related Mortgage to the Trustee (which may be assigned in blank), certified by the recording office, or, if such assignment is in the process of being recorded, a copy of the related Mortgage transmitted for recordation certified by an officer of Wells Fargo Bank or applicable Wells Fargo Bank Correspondent to be a true and correct copy of such assignment submitted for recordation; provided, however, if recordation is not required as described below, an assignment in recordable form (which may be assigned in blank) with respect to the related Mortgage;

**Rene and Jerrold Larson, Plaintiff(s)**
**532 E. Stonecreek Dr.**
**La Center, WA 98629**

# EXHIBIT "A"

| | | |
|---|---|---|
| WORLD SAVINGS BANK, FSB | ) | |
| Plaintiff | ) ) ) | Case No |
| | ) | AFFIDAVIT OF LAURA MATHEWS |
| Vs | ) ) ) | |
| | ) | |
| Defendant, | ) | |
| RENE L. LARSON | ) ) ) | |

I, Laura Mathews, of legal age and competent to testify, state as follows based on my own personal knowledge understanding and belief and make this Affidavit/ Declaration based on personal knowledge and state as follows under the penalties of perjury under the laws of the People of the state of Washington:

1. I Laura Mathews am a Certified Forensic Loan Auditor Certified with the National Association of Mortgage Underwriters.

2. I certify that on September 29, 2010 I completed a Forensic and a Securitization audit on the property located at 532 E. Stone Creek Dr., La Center, WA 98629, Loan # 00242292429.

3. Said Forensic and Securitization is listed in my report entitled Forensic Audit Report dated 9/29/2010.

4. Said Forensic Audit summarizes the fraud and predatory lending violation within said loan.

SUMMARY:    a. Total TILA Violations: 12

                     b. RESPA Violations: 3

                     c. Predatory Lending Violations: 14

5. Rene L. Larson received a note from World Savings Bank, FSB in the amount of $206,250.00 the loan is a 12 MO OPTION ARM NEG AM PICK A PAY Cash-out Refinance Adjustable Rate Note due in 30 years .

The note is for $404,000.00 amortized over 30 years in an initial start rate of 1.95% with a 3 year prepayment penalty and a LTV of 75%.

The payment feature is an Option Arm, this loan program is and adjustable rate mortgage with flexibility of making one of several possible payments on the mortgage every month. The homeowner has the option of the minimum payment, the interest only payment or the fully amortized 15 year payment.

Option ARM loan programs are only right for the home owner if they are intending to own their property for a short time and prefer affordability and flexibility in their monthly payments. However if they select the minimum payment option (which most do) the homeowner should be prepared for a sudden increase in their monthly payments thereafter.

The initial interest rate is 4.782% the rate and payment will adjust after the first year and every month thereafter, the lender will determine the rate based on the Margin of 3.650% and the current CODI index. The cap rate or Max Rate is 11.950%.

The initial minimum payment of $757.20 (1.950% interest rate), is not sufficient to cover the interest due under the Note, the difference will be added to the Principle balance of the Note.

By paying the Minimum Payment Rene Larson would end up upside down in the Mortgage this payment feature allows the homeowner to Neg-Am up to 125% of the Original Principal Balance which would be $257,812.50 a difference of $69,562.50 increase from the original balance.

Made this ___*2q*<sup>th</sup>___ day of _September_ , ___2010___.


Laura Mathews

_Laura Mathews_ (signature)

Certified Forensic Loan Auditor
PO Box 99700
Lakewood, WA 98496




## Notary Statement

State of Washington }
                }    ss
County of King }

**BE IT REMEMBERED,** that on the ___*2q*<sup>th</sup>___ day of _September_ 2010, before me, the undersigned, a Notary Public in and for the state of Washington, personally appeared, Laura Mathews who proved to me to be the same individual who executed the within instrument, and, affirmed that she is personally fully aware of the contents and accuracy of the statements made therein, and affirms that the document is, to the very best of her knowledge, true and correct.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and affixed My Official seal the day and year last above written.

_DJ Wilson_ (signature)

Notary Public for ___Washington___

Commission Expires on ___7/10/12___

(Notary Seal: DJ WILSON, NOTARY PUBLIC, STATE OF WASHINGTON, COMMISSION EXPIRES JULY 10, 2012)

**Prepared for:**

## John Sterbick – Attorney

**Borrower(s):**

**Rene L. Larson**

**Property:**

**532 E. Stone Creek Dr., La Center 98629**



# FORENSIC AUDIT REPORT

Rene L. Larson

Equitas Solutions Inc.
PO Box 99700
Lakewood, WA 98496
**Laura Mathews**
**9/29/2010**

## **TABLE OF CONTENTS**

Advisory Letter _____

Introduction _____

Report Summary _____

Summary of Loan Terms _____

Financial & Underwriting Analysis _____

Truth in Lending Act Analysis _____

HOEPA Analysis _____

RESPA Analysis _____

Predatory Indicators _____

Potential Additional Claims Analysis _____

Discrimination

Fraud

Foreign Language Translation

Breach of Contract

Breach of Implied Covenant of Fair Dealing

Breach of Fiduciary Duty

Unjust Enrichment

Unconscionability

Civil Conspiracy

*Unfair/Deceptive Business Practices*

Other Claims & Recommended Legal Research _____



# Certified Forensic Loan Auditor (NAMU®-CFLA)

is hereby granted to

## Laura L. Mathews

to certify that he/she is a member of NAMU® in good standing.

Member #: 1480239

Active Member since: August 3, 2010

*[signature]*

NAMU® Membership Director

**IMPORTANT LEGAL NOTICE:** NAMU® certifies that you have successfully completed a 32-hour in-person seminar performed by California-Based business-to-business litigation support company Certified Forensic Loan Auditors, LLC. In addition, NAMU® certifies that you have successfully passed a criminal/sex offender background check and agreed to NOT solicit homeowners directly, unless you are a licensed attorney. This 32-hour seminar is strictly intended to provide professional development "how-to" training, and does not imply any State or Federal Government affiliation. Furthermore, this training does not imply nor encourage trainees to offer foreclosure relief/prevention assistance services directly to homeowners, as it is illegal in many states for loan-modification consultants and businesses to charge up-front fees for their services. Additionally, many states now require individuals and businesses offering mortgage-foreclosure consulting, loan-modification and foreclosure-assistance services to post a $100,000 bond. Please note Certified Forensic Loan Auditors, LLC. is exclusively a business-to-business litigation support company, and does NOT work directly with home owners/borrowers in foreclosure. Also, NAMU® is NOT owned or operated by Certified Forensic Loan Auditors, LLC.

John Sterbick
1010 South "I" Street
Tacoma, WA 98405
(253) 383-0140

RE:     Forensic Audit for John Sterbick

        Loan# 00242292429

Dear Audit Recipient:

The loan transaction for the above-referenced borrower/property has been manually audited
[1]for violations of the Truth in Lending Act [16 U.S.C. §1601] ("TILA"), Home Ownership Equity
Protection Act [12 C.F.R. 226.32 *et seq.*] ("HOEPA"), the Real Estate Settlement Procedures Act
[12 U.S.C. § 2601] ("RESPA"), and to the extent applicable, violations of other state and federal
laws discussed below.

This report was based exclusively on the documentation provided.  It was also required that we
make reasonable assumptions respecting disclosures and certain loan terms that, if erroneous,
may result in material differences between our findings and the loan's actual compliance with
applicable regulatory requirements.  While we believe that our assumptions provided a
reasonable basis for the review results, we make no representations or warranties respecting
the appropriateness of our assumptions, the completeness of the information considered, or
the accuracy of the findings.

The contents of this report are being provided with the understanding that we are not
providing legal advice, nor do we have any relationship, contractual or otherwise, with anyone
other than the recipient.  We do not, in providing this report, accept or assume responsibility
for any other purpose.

Sincerely,

*Laura Mathews*

**Laura Mathews**

---

[1] Please note that a complete mortgage servicing audit (i.e., audit for RESPA and/or breach of contract violations
for the entire servicing history of the loan) is not included in this audit; QWR recommended before such audit and
be accomplished.

3

## INTRODUCTION

### Interested Parties:

| ORIGINAL MORTGAGE LENDER/TABLE FUNDER: | ESCROW/TITLE: | MORTGAGE NOMINEE/BENEFICIARY: |
|---|---|---|
| World Savings Bank FSB 1901 Harrison St. Oakland, CA 94612 | First American Title Company 2103 NE 129th St. #100 Vancouver, WA 98686 | World Savings Bank, FSB, It's Successors and/or Assigns |
| MORTGAGE BROKER: | MORTGAGE TRUSTEE | SECURITIZATION |
| All fund Mortgage 833 Pacific Ave Ste. G Tacoma, WA 98444 | First American Title Company A CALIFORNIA CORPORATION | Likely. |

### Documents Provided for Review:

| 1st | 2nd | |
|---|---|---|
| X | | Loan Application (1003) |
| | | Loan Commitment Letter MISSING |
| X | | Good Faith Estimate |
| X | | Truth in Lending Disclosure Statement |
| | | (3-day) Notice of Right to Cancel (may not find with Purchase money loans) MISSING |
| X | | HUD-1 (or HUD-1 A) Settlement Statement |
| X | | Note (with riders or attachments |
| X | | Deed of Trust |
| | | Underwriting and Transmittal Summary (Form 1008) MISSING |
| | | Appraisal Report MISSING |
| | | RESPA Servicing disclosure MISSING |
| | | Hazard Insurance disclosure MISSING |
| | | Credit score disclosure MISSING |
| | | Lenders Closing Instructions MISSING |
| | | Affiliated Business Arrangement Disclosure MISSING |
| X | | I/O and/or Neg-Am disclosure |
| | | Arm Disclosure  MISSING |

4

## REPORT SUMMARY

Total Potential TILA Violations (see p. 10): **12**

Total Potential HOEPA Violations (see p. 12): **0**

Total Potential RESPA Violations (see p. 13): **3**

Total Predatory Lending Violations: (see p. 14): **14**

| CLAIM | CONCLUSION | DETAILS |
|---|---|---|
| Underwriting | FAIL | See p. 8 |
| TILA APR Tolerance Test | PASS | See pp. 10-11 |
| TILA Finance Charge Test | FAIL | See pp. 10-11 |
| TILA Right of Rescission | FAIL | See pp. 10-11 |
| Predatory Indicators | FAIL | See p. 14 |
| Discrimination* | POSSIBLE | See discussion at p. 17 |
| Civil Code § 1632* | N/A | |
| Fraud* | POSSIBLE | See discussion at p. 18 |
| Other State/Common Law Claims* | POSSIBLE | See discussion at p. 18 |

*(Probability of Violations Ratings: No Evidence or Possible)

## Auditor's Summary:

The Homeowner received a loan from World Savings Bank, FSB in the amount of $206,250.00 the loan is a 12 MO OPTION ARM NEG AM PICK A PAY Cash-out Refinance Adjustable Rate Note due in 30 years .

The loan is for $404,000.00 amortized over 30 years in an initial start rate of 1.95% with a 3 year prepayment penalty and a LTV of 75%.

The payment feature is an Option Arm, this loan program is and adjustable rate mortgage with flexibility of making one of several possible payments on the mortgage every month. The homeowner has the option of the minimum payment, the interest only payment or the fully amortized 15 year payment.

Option ARM loan programs are only right for the homeowner if they are intending to own their property for a short time and prefer affordability and flexibility in their monthly payments.  However if they select the minimum payment option (which most do) the homeowner should be prepared for a sudden increase in their monthly payments thereafter.

The initial interest rate is 4.782% the rate and payment will adjust after the first year and every month thereafter, the lender will determine the rate based on the Margin of 3.650% and the current CODI index.  The cap rate or Max Rate is 11.950%.

5

The initial <u>minimum</u> payment of $757.20 (1.950% interest rate), is not sufficient to cover the interest due under the Note, the difference will be added to the Principle balance of the Note.  By paying the Minimum Payment the homeowner would end up upside down in the Mortgage this payment feature allows the homeowner to Neg-Am up to 125% of the Original Principal Balance which would be $257,812.50 a difference of $69,562.50 increase from the original balance.

The borrower's received a notice of Trustee's Sale from Regional Trustee Services Corporation on 4/23/2010.

## SUMMARY OF LOAN TERMS

The **essential loan terms** were found to be as follows:

| | |
|---|---|
| Type of Loan: | **REFINANCE** |
| Loan Origination Date: | **02/19/2004** |
| Amount of Loans: | **$206,250.00** |
| Originating Lender: | **WORLD SAVINGS BANK, FSB** |
| Loan Broker: | **ALL FUND MORTGAGE** |
| Current Servicer: | **TBD** |
| Current Note Holder: | **Likely Securitized** |
| 1st Note (ARM) Terms: | |
| Initial Fixed Rate: | **4.782%** |
| Term of Initial Rate: | **360 MONTHS** |
| Initial Payment: | **$757.20** |
| Payment Feature: | **12 MO OPTION ARM NEG AM PICK A PAY** |
| Index Measure: | **CODI INDEX** |
| Index Rate: | **1.1133% (historical data index)** |
| Margin: | **3.650%** |
| Fully Indexed Rate: | **4.7633%** |
| Min/Max Rate: | **1.950%/11.950%** |
| TILA disclosed APR: | **4.986%** |
| Total Closing Costs: | **$6,102.67** |
| Total "Points and Fees"% | **3.%** |
| Prepayment Penalty: | **3 YEARS** |
| Unsecured Debt Paid off by Refinance: | **$25,318.00** |
| Loan Origination Fees: | **$2,312.50** |
| Loan Discount Fees: | **0** |
| Total Broker Fees: | **$6,437.50 (3.121%)** |
| 2nd Note (Fixed) Terms: | |
| Fixed Rate: | **N/A** |
| Term of Loan: | **N/A** |
| Payment Feature: | **N/A** |
| TILA disclosed APR: | **N/A** |
| Total Closing Costs: | **N/A** |

# FINANCIAL & UNDERWRITING ANALYSIS

**Underwriting Standards**

The purpose of an underwriter is to determine whether the borrowers can qualify for a loan and if the borrowers have the ability to repay the loan.  This determination of the ability to repay a loan is based upon employment and income in large measure, which is proved by getting pay stubs, 1040's, W-2's, and a Verification of Employment and Income on the borrowers.

If an underwriter has evaluated the loan properly, then there should be no question of the ability of the borrower to repay the loan.  Debt ratios will have been evaluated, credit reviewed and a proper determination of risk made in relation to the loan amount.  Approvals and denials would be made based upon a realistic likelihood of repayment.

**Automated Underwriting Systems**

The underwriter's role in approving loans has been delegated to a support role in the past decade. Automated Underwriting Systems became the normal approval method.  An underwriter or even a loan officer would simply input the data and the Automated System would give an approval or denial. Any documents requested would be gathered and then loan documents drawn and signed.

The real issue with the automated systems is that they were not designed to be the "final word" in approval.  The system approval was designed to be a guide, a preliminary approval and nothing more. After approval was received, the underwriter would then be expected to extensively review the file, closely examining the documents for final approval.

**DISSUSSION:**     Borrower's financial status at the time of the loan is taken from the loan application.  An analysis of borrower's financial status at the time of the loan reveals the following:  The Following figures are based on the information from the Loan Application and have not been verified.

| Gross Monthly Income | Mortgage Payment (PITI) | Other Monthly Debt | Total Monthly Debt | Debt-to-Income ratio |
|---|---|---|---|---|
| $5,000.00 | $1,038.11 | 0 | $1,038.11 | 21%/21% |

**CONCLUSION:**  Normal underwriting practices include analysis for a 28/36% debt-to-income ratio.  During 2003 to 2006, subprime lending involved higher DTI ratios, from 33/38% to 38/50%.  I have reviewed the documentation, the Note was a Stated Income Stated Asset Note.  The Lender did not verify the homeowner's income through paystubs, W2's, Tax Returns or a 4506-T form.

8

The <u>minimum payment was used to calculate the DTI on the application</u> of $757.20 plus Taxes, Insurance for a total payment of $1,038.12 thus putting the DTI at 21%.

The Interest Only Payment would be $821.91 plus TX, INS $1,102.84. The fully index rate of 4.763% would put the combined payment at $1,358.44 both of these payments put the DTI at 22% interest only and 27% at the fully indexed rate.  However if the Lender would have calculated the payment based on the Max Rate of 11.950% the PITI payment would be $2,394.51 putting the DTI at 48%.

The application states the homeowner's income at $5,000.00 per month she was working in a Video Store in a small town.  Recommend investigation into the homeowner's actual income to determine proper ratios.

The purpose of an underwriter is to determine whether the borrowers can qualify for a loan and if the borrowers have the ability to repay the loan. This determination of the ability to repay a loan is based upon employment and income in large measure, which is proved by getting pay stubs, W-2's and a Verification of Employment and Income on the borrowers.  If an underwriter has evaluated the loan properly, then there should be no question of the ability of the borrower to repay the loan.  Debt ratios will have been evaluated, credit reviewed and a proper determination of risk made in relation to the loan amount.  Approvals and denials would be made based upon a realistic likelihood of repayment.

Risk layering is the concept of borrowers having multiple elements of risk in any one loan. Risk would be greater as the different factors that lenders should be concerned about were found in each loan.  The more layers of risk, the greater the likelihood of default.  Layers of risk in this loan include................

1. Stated income

3.  High Debt to Income Ratios

4.  Discounted Rate

5.  Prepayment Penalty

6.  Lack of due diligence in underwriting

7.  ARM loan

8.  Interest Only

9.  Negative Amortization

10. Excess Fees/Charges

11. Yield Spread Premium

13. Balloon Payment

18. High Margin

## TRUTH IN LENDING ACT ANALYSIS

**APPLICATION:** The TILA applies because the transaction involves the extension of credit to a consumer for personal, family or household purposes that is subject to a finance charge and/or payable by written agreement in more than four installments. 15 U.S.C. §§ 1601-1666j.

| Pass | Fail | | | |
|------|------|---|---|---|
| | X | Notice of Right to Cancel (2 copies per borrower; filled out completely). 12 C.F.R. § 226.23(b). NO EVIDENCE IN FILE | | |
| X | | TIL Disclosure Statement provided. 12 C.F.R. §§226.17, 226.18 | | |
| | X | Payment Schedule correctly identified on TIL. 12 C.F.R. §§226.18(g).(h). ARM | | |
| | X | Interest Rate consistent and properly disclosed: Loan app-GFE-Commitment-TIL, variable rate. 12 C.F.R. § 226.17-18. MISSING COMMITMENT, VARIABLE RATE | | |
| | X | Delivered good faith estimates of disclosures (preliminary TILDS) within 3 days of loan application. 12 C.F.R. §§ 226.19(a). MISSING INITIAL LOAN APPLICATION, GFE | | |
| | X | "Consumer Handbook on Adjustable-Rate Mortgages" (CHARM) provided within 3 days of application. [Or equivalent disclosure – see 12 C.F.R. § 226.19(b)]. NO EVIDENCE IN FILE | | |
| | X | Interest-only payment feature adequately disclosed 15 U.S.C. §§ 1638, 12 C.F.R. § 226.17-18. | | |
| | X | Negative-amortization payment feature adequately disclosed. 15 U.S.C. §§ 1638, C.F.R. § 226.17-18. | | |
| | X | Itemization of amount financed. C.F.R. § 226.18. [RESPA-GFE may be substituted]. | | |
| | X | Property/Hazard Insurance disclosure provided (choice by consumer). C.F.R. § 226.4(d) (2). MISSING DISCLOSURE | | |
| | X | Prepayment Penalty disclosed. C.F.R. § 226.18(k). MISSING PREPAYMENT RIDER | | |
| X | | **APR Calculation**<br><br>See Note 1 below for further discussion. | **1st Lien Result**<br>Disclosed: **4.986%**<br>Vs.<br>Actual: **4.944%**<br>Difference= ≤.042% ≥ | **2nd Lien Result**<br>Disclosed:<br>Vs.<br>Actual:<br>Difference = ≤ ≥ |
| | X | **Finance Charge Calculation**<br><br>See Note 2 below for further discussion. | 1st Lien Result<br>Disclosed: **$201,692.07**<br>Vs.<br>Actual: **$202,047.47**<br>Difference= ≤**$355.40** ≥ | 2nd Lien Result<br>Disclosed:<br>Vs.<br>Actual:<br>Difference = ≤ ≥ |
| | X | All disclosures accurately reflect the legal obligation between the parties. 15 U.S.C. §§ 1638, 12 C.F.R. § 226.17©. | | |

*Total Potential TILA Violations: 12*

**FURTHER RECOMMENDATIONS:**

**POTENTIAL REMEDIES FOR VIOLATIONS:** Where a material disclosure was not given or inaccurate (APR, finance, amount financed, payment schedule, or total of payments), or consumer was not provided with proper notice of right to cancel, the right of rescission is extended to 3 years. Statutory (up to $2,000) and actual damages, as well as attorney's fees, may also be available for the violations noted.

## TILA NOTATIONS

Under the Truth in Lending Act ("TILA"). Rescission rights arise when: (1) the transaction is a consumer credit transaction; (2) in which a non-purchase lien or security interest is or will be placed; and (3) on the consumer's principal dwelling. In a rescindable transaction, each consumer must be given a copy of the TILA disclosure statement withal "material" information correctly disclosed and notice of a three-day right to rescind. If these material disclosures are not properly provided, the three-day right to rescind is extended until one of the following events occurs: (1) all materials disclosures are correctly given and a new three day notice of cancellation, (2) the expiration of three years after consummation of the transaction; (3) the transfer of all of the consumer's interest in the property; or (4) the sale of the property. All persons entitled to rescind under TILA must receive two copies of the rescission notice rights and on copy of the material disclosures at or before closing. The notice of rescission must provide the following information: (1) the retention or the acquisition of a security interest in the consumer's principle dwelling; (2) the consumer's right to rescind; (3) how to exercise the right to rescind with a form for that purpose, designating the address of the creditor's place of business; (4) the effects of rescission; and (5) the date the rescission period expires.

### 1.   Annual Percentage Rate Tolerances and Right of Rescission

An APR deviation is a material violation permitting the right of rescission if: (a) it was a refinance, (b) within 3 years of the transaction, and (c) outside the tolerances set forth below.

12 CFR § 226.22(a)(2) provides: "As a general rule, the annual percentage rate shall be considered accurate if it is not more than 1/8 of 1 (.125%) percentage point above or below the annual percentage rate determined in accordance with paragraph (a)(1) of this section." Under 12 CFR 226.22 (a)(3): "In an irregular transaction, the annual percentage rate shall be considered accurate if it is not more than 1/4 of 1 (.25%) percentage point above or below the annual percentage rate determined in accordance with paragraph (a)(1) of this section."

### 2.   Finance Charge Tolerances and Right of Rescission

12 CFR § 226.18(d) requires the disclosure of the finance charge amount. For purposes of "mortgage loans" 12 CFR § 226.18(d)(1) provides: "In a transaction secured by real property or a dwelling, the disclosed finance charge and other disclosures affected by the disclosed finance charge (including the amount financed and the annual percentage rate) shall be treated as accurate if the amount disclosed as the finance charge: (I) is understated by no more than $100; or (ii) is greater than the amount required to be disclosed." Statutory and actual damages are available for this violation.

A finance charge deviation is a material violation permitting the right of rescission if: (a) it was a refinance, (b) within 3 years of the transaction, and (c) outside the tolerances set forth below.

12 CFR § 226.23(g) provides: "Tolerances for accuracy.—(1) One-half of 1 percent tolerance. Except as provided in paragraphs (g)(2) and (h)(2) of this section, the finance charge and other disclosures affected by the finance charge (such as the amount financed and the annual percentage rate) shall be considered accurate for purposes of this section if the disclosed finance charge: (I) is understated by no more than ½ of 1 percent of the face amount of the note or $100, whichever is greater; or (ii) is greater than the amount required to be disclosed. (2) One percent tolerance. In a refinancing of a residential mortgage transaction with a new creditor (other than a transaction covered by § 226.32), if there is no new advance and no consolidation of existing loans, the finance charge and other disclosures affected by the finance charge (such as the amount financed and the annual percentage rate) shall be considered accurate for purposes of this section if the disclosed finance charge: (I) is understated by no more than 1 percent of the face amount of the note or $100, whichever is greater; or (ii) is greater than the amount required to be disclosed."

15 U.S.C. § 1635 (I) also provides: "Rescission Rights In Foreclosure. – (2) Tolerance for Disclosures. – Notwithstanding section 106(f), and subject to the time period provided in subsection (f), for the purposes of exercising any rescission rights after the initiation of any judicial or non judicial foreclosure process on the principal dwelling of the obligor securing an extension of credit, The disclosure of the finance charge and other disclosures affected by any finance charge shall be treated as being accurate for purposes of this section if the amount disclosed as the finance charge does not vary from the actual finance charge by more than $35 or is greater than the amount required to be disclosed under this title."

## HOEPA ANAYLYSIS

**APPLICATION:**  Neither statute like applies as the estimated APR [~xx] would not exceed 8% over the comparable yield on treasury securities [~10], nor do the "total points and fees" exceed 8% or 6%, respectively, of the loan amount.  NOT A HOEPA LOAN

| Pass | Fail | |
|------|------|---|
| | | APR disclosed. 12 CFR 226.32(c)(2) |
| | | 3 days prior to closing, the APR and disclosure statement similar to the following: "You are not required to complete..." (HOEPA). |
| | | 3 day prior to closing, disclosure: "CONSUMER CAUTION AND HOME OWNERSHIP CONSELING NOTICE..." |
| | | Disclosed the amount of the borrower's regular monthly payment. 12 CFR 226.32(c) (3). |
| | | If variable, includes a statement that the interest rate and monthly payment may increase and the maximum payment that could be reached.  12 CFR 226.32(c) (4). |
| | | No balloon payments prior to ten years.  12 CFR 226.32(d) (1) (I)-(iii). |
| | | Disclosed amount of any balloon payment 12 CFR 226.32 (c) (3). |
| | | No prepayment penalty after first 5 years, source of funds is not refinance by creditor, and consumers total monthly is no more than 50% of DTI. 12 CFR 226.32(d) (7). |
| | | No increase in the interest rate in the event of default. 12 CFR 226.32(D) (4). |
| | | No negative amortization. 12 CFR 226.32(d) (2). |
| | | No refinance within one year. 12 CFR 226.34 |
| | | No prepaid payments. 12 CFR 226.321(d) (3). |
| | | Engaging in a pattern or practice of extending such credit to a borrower based on the borrower's collateral rather than considering the borrower's current and expected income, current obligations, and employment status to determine whether the borrower is able to make the scheduled payments to repay the obligation, is in violation of Section 129(h) of TILA, 15 U.S.C. § 1639(h), and see also, Regulation Z, 12 C.F.R. § 226.32. |
| | | If refinance transaction, disclosed total amount borrowed and if the loan amount includes premiums or other charges for optional credit insurance or debt cancellation coverage, that fact shall be stated. 12 CFR 226.32(c) (5). |

*Total Potential HOEPA Violations:*

**POTENTIAL REMEDIES FOR VIOLATIONS:**  All TILA remedies, plus all finance charges and fees if "material" violation, pursuant to 15 U.S.C. § 1640(a) (4).

## REAL ESTATE SETTLEMENT PROCEDURES ACT ANALYSIS

**APPLICATION:** The RESPA applies because lender regularly extends federally related mortgage loans aggregating more than $1 million per year, and intended for the purchase of a one- to four-family residential property. 12 U.S.C. §§ 2601.2617.

| Pass | Fail | |
|------|------|---|
| | **X** | Informed borrower of intention to transfer the servicing of the loan and/or failed to inform the borrower of the actual transfer within fifteen (15) days before the effective date of the transfer. 24 CFR § 3500.21. MISSING SERVICING DISCLOSURE |
| **X** | | Did not require deposit of funds in escrow in excess of the statutorily permitted amounts. 24 CFR § 3500.17 |
| **N/A** | | Purchase Money: Provided the Special Information Booklet explaining the settlement costs within three (3) business days after consumer submitted loan application. 24 CFR § 3500.6 |
| **TBD** | | No fees charged for preparation of the settlement statement, escrow account statement, and/or the TILA disclosure statement. 24 CFR § 3500.12. |
| | **X** | Disclosed all affiliated business arrangements. 24 CFR § 3500.15. MISSING |
| | **X** | Did not give, provide or receive a hidden fee or thing of value for the referral of settlement business, including but not limited to, kickbacks, hidden referral fees, and/or yield spread premiums. 24 CFR § 3500.14. YSP |
| **TBD** | | Properly and timely paid for property taxes, insurance and other charges for which Defendants are collecting within an escrow impound account; or other servicing violations. 24 CFR § 3500.17. |
| **X** | | HUD-1 provided at closing (1 day before if requested) and accurate. 24 CFR § 3500.8(b) |
| **TBD** | | No fees charged in excess of the reasonable value of goods provided and/or services rendered. |
| **N/A** | | Purchase Money: Seller did not impose use of particular service provider. 24 CFR § 3500.16 |

**Total Potential RESPA Violations:**

**FURTHER RECOMMENDATIONS:** QWR/discovery re mortgage servicing for potential servicing violations or breach of contract.

**POTENTIAL REMEDIES FOR VIOLATIONS**: Actual damages, statutory (up to $1000 if show pattern and practice), and treble damages for excessive portion of fees (below), plus attorney's fees and costs for violations noted.

The following are **suspect or excessive closing costs/fees** that may be actionable for treble damages pursuant to 12 U.S.C. § 2607: **BROKER FEE $2,312.50, YEILD SPREAD PREMIUM $ 4,125.00**

13

## PREDATORY LOAN INDICATORS

"Predatory lending" is a general term used to describe unfair, deceptive, or fraudulent practices of lenders during the loan origination process. Predatory lending is often a combination of several factors that can only be evaluated in the context of the overall lending transaction. Typically, no single factor can be relied upon to consider it a predatory loan.

A large number of agencies and consumer organizations recognize predatory lending, including, for example, the Department of Housing and Urban Development, federal Deposit Insurance Corporation, National Consumer Law Center, California Department of Real Estate, Fannie Mae, National Association of Consumer Advocates, Association of Community Organizations for Reform Now, National Home Equity Mortgage Association, and Center for Responsible Lending.

The Predatory lending factors present in the subject transaction were found to be as follows:

| Pass | Fail | |
|------|------|---|
| TBD | | Solicitation for refinance. |
| | X | Mortgage broker and corresponding lender involved. |
| TBD | | Borrower was a minority and/or the transaction was conducted in a foreign language. |
| X | | Loan-to-value ratio above 80%. 75% |
| | X | Debt-to-income ratio above 28/36%. 48% |
| | X | Teaser rate involved. |
| | X | Interest rate on 1st was more than 2 points above: 6.08% (2.77 margin) [average US 5/1 ARM rate] or 6.4% [average 30-year fixed]. (Source: Freddie Mac 1/2003-12/2006). |
| | X | Excessive closing Costs/Fees. |
| | X | Prepayment Penalty. |
| | X | Interest-Only Payments. |
| | X | Negative Amortization Payments. |
| | X | Broker Compensation ≥ 2% (including yield spread premium). 3.121% |
| | X | Loan Flipping – refinance within 3 years of previous loan. 2 YEARS |
| | X | Balloon payments. NEG AM |
| | X | Unsecured Debt Shifted to Secured (i.e., credit cards). $25,318.00 |
| X | | Unnecessary insurance and other products offered in closing. |
| N/A | | Mandatory arbitration clause in Note. |
| | X | Bait & Switch – e.g., borrower initially offered lower rate than final Note. |
| | X | Other unfair, deceptive, or fraudulent practices in transaction. |

*Total Predatory Indicators: 14*

## PREDATORY LOAN ANALYSIS

**Predatory Lending**

The terms "abusive lending" or "predatory lending" are most frequently defined by reference to a variety of lending practices. Although it is generally necessary to consider the totality of the circumstances to assess whether a loan is predatory, *a fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered.*

While such disregard of basic principles of loan underwriting lies at the heart of predatory lending, a variety of other practices may also accompany the marketing of such credit, Some Predatory Lending Practices found in this loan.

**Bait & Switch**
The practice of offering a loan at one rate and then changing the loan program at the last moment. It can also apply to the negative amortization loan.

**Negative Amortization**
Loans where the borrower is often told that the payment and rate are actually such that the balance on the loan can increase monthly.  See above analysis.

**Excessive Fees and Rates**
Requires borrowers to pay interest rates, fees and/or charges not justified by marketplace economics in place at the time the lien was originated.

**Loan Flipping & Equity Stripping**
Repeated refinancing of borrowers into loans that have no tangible benefit to the borrower. Can be the same lender or different ones.  Loans and refinances whereby equity is removed from the home through repeated refinances, consolidation of short term debt into long term debt, negative amortization or interest only loans whereby payments are not reducing principle, high fees and interest rates. Eventually, borrower cannot refinance due to lack of equity.

**Shifting Unsecured Debt into Mortgage**
Mortgage lenders badger homeowners with advertisements and solicitations that tout the "benefits" of consolidating bills into a mortgage loan.  The lender fails to inform the borrower that consolidating unsecured debt such as credit cards and medical bills into a mortgage secured loan by the home is a bad idea.  If a person defaults on an unsecured debt, they do not lose their home.  If a homeowner rolls their unsecured debt into their mortgage loan and default on their mortgage payments, they can lose their home.  Furthermore, since unsecured debt generally is paid off between three and five years, shifting unsecured debt into a mortgage loan extends the payoff period to 15 to 30 years. Paying off unsecured debt with a mortgage loan also necessarily increases closing costs because they are often calculated on a percentage basis, thereby increasing the loan balance.  Whereas the old total monthly household debt payments may in some cases be less than the monthly payments on the

15

new mortgage loan, the monthly mortgage payments are often more than the previous mortgage payments, thus exacerbating the risk that the homeowner will lose the home to foreclosure.

### High Debt Ratios
This is the practice of approving loans with high debt ratios, usually 50% or more, without determining the true ability of the borrower to repay the loan. Can often be seen with Prime borrowers approved through the Automated Underwriting Systems.

### Fraudulently Caused to Execute Loan Documents
Adjustable rate mortgage loan was an inter-temporal transaction on which Plaintiffs had only qualified at the initial teaser fixed rate, and could not qualify for the loan once the interest rate terms changed in two years.

### Deception, Fraud, Unconscionable
Is marketed in a way that fails to fully disclose all material terms. Includes any terms or provisions which are unfair, fraudulent or unconscionable. Is marketed in whole or in part on the basis of fraud, exaggeration, misrepresentation or the concealment of a material fact. Includes interest only loans, adjustable rate loans, and negative amortization and HOEPA loans.

### Stated or No Income/No Assets
Is based on a loan application that is inappropriate for the borrower. For instance, the use of a stated-income loan application from an employed individual who has or can obtain pay stubs W-2 forms and tax returns.

### Lack of Due Diligence in Underwriting
Is underwritten without due diligence by the party originating the loan. No realistic means test for determining the ability to repay the loan. Lack of documentation of income or assets, job verification. Usually with Stated Income or No documentation loans, but can apply to full documentation loans.

### Inappropriate Loan Programs
Is materially more expensive in terms of fees, charges and/or interest rates than alternative financing for which the borrower qualifies. Can include prime borrowers who are placed into subprime loans, negative or interest only loans. Loan terms whereby the borrower can never realistically repay the loan.

### Contractual Interference
By paying the broker a Par Premium or YSP to bring a loan to a lender, and the loan having an interest rate higher than what the borrower could have qualified for, the lender has engaged in a practice of interfering with the Fiduciary Duty of the broker to the borrower.


DISCUSSION: Summary of Underwriting Decision by Auditor

The Auditor has reviewed the approval process of this loan. I find that the underwriting process was flawed in that it did not take into consideration the ability of the borrower to repay this loan with a realistic means test. The borrowers signed a 4506-T Income Tax Disclosure form and an IRS form 8821. These forms allow the lender to check the

16

**income of the borrowers.  Failure to do so was a lack of due diligence on the part of the lender regarding underwriting standards and the ability to repay the loan, based on the loan program the lender would have to decline the loan. (Other areas of applicability regarding the 4506-T could be considered breach of the lenders contractual duty to conduct the transaction in good faith and through fair dealing: gross negligence or breach of fiduciary duty as a licensed professional under their lending license if applicable).**

## POTENTIAL ADDITIONAL CLAIMS ANALYSIS
(Probability of Violations Ratings: No Evidence or Possible)
**Note: Federal laws may preempt certain state claims.**

**Equal Credit Opportunity Act (discrimination)**                                      **No Evidence**

The Equal Credit Opportunity Act provides at Sec.202.1 – Authority, scope, purpose:

> (b) Purpose.  The purpose of this regulation is to promote the availability of credit to all Creditworthy applicants without regard to race, color, religion, national origin, sex, Marital status, or age (provided the applicant has the capacity to contract); to the fact that All or part of the applicant's income derives from a public assistance program; or to the Fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act.  The regulation prohibits creditor practices that discriminate on the basis Of any of these factors.  The regulation also requires creditors to notify applicants of Action taken on their applications; to report credit history in the names of both spouses on An account; to retain records of credit applications; to collect information about the Applicant's race and other personal characteristics in applications for certain dwelling-Related loans; and to provide applicants with copies of appraisal reports used in Connection with credit transactions.

Additionally, at Sec. 202.4 – General Rule Prohibiting Discrimination:

> 1.   Scope of section.  The general rule stated in Sec.202.4 covers all dealings, without Exception, between an applicant and a creditor, whether or not addressed by other Provisions of the regulation.  Other sections of the regulation identify specific practices That the Board has decided are impermissible because they could result in credit Discrimination on a basis prohibited by the act.  The general rule covers, for example, Application procedures, criteria used to evaluate creditworthiness, administration of Accounts and treatment of delinquent or slow accounts.  Thus, whether or not specifically Prohibited elsewhere in the regulation, a credit practice that treats applicants differently On a prohibited basis violates the law because it violates the general rule.  Disparate Treatment on a prohibited basis is illegal whether or not it results from a conscious intent To discriminate.  Disparate treatment would be found, for example, where a creditor Requires a minority applicant to provide greater documentation to obtain a loan than a Similarly situated nonminority applicant.  Disparate treatment also would be found where A creditor waives or relaxes credit standards for a nonminority applicant but not for a Similarly situated minority applicant.  Treating applicants differently on a prohibited basis Is unlawful if the creditor lacks a legitimate nondiscriminatory reason for its action, or if The asserted reason is found to be a pretext for discrimination.

17

**DISCUSSION: No direct evidence of discrimination, but the loan terms offered by this lender may be less than favorable: recommend investigation into borrowers credit, income etc.**

**Fraud**                                                                                          *Possible*

Liability for actual fraud is limited to acts committed by or with the connivance of a party to a contract With the intent to deceive another party to the contract and induce that party to enter into the contract Provides that:

> (a)  A party to a contract may rescind the contract in the following cases:

> (1)  If the consent of the party rescinding, or of any party jointly contracting with him, was given by Mistake or obtained through duress, menace, fraud, or undue influence, exercised by or with the Connivance or the party as to whom he rescinds, or of any other party to the contract jointly interested With such party.

**DISCUSSION: It appears the lender approved the loan based on STATED income and no assets verification. The lender has a fiduciary responsibility to the borrower to perform their due diligence before extending credit.  However, the lender did NOT perform their due diligence by confirming the borrower's ability to make his monthly payments over the lifetime of the loan.  Recommend investigation into the loan programs presented to the borrower from the beginning of the transaction.**

**Fraud in the factum**
**Fraud in the Factum is a type of fraud where misrepresentation causes one to enter a transaction without accurately realizing the risks, duties, or obligations incurred.  Black's Law Dictionary (2nd Pocket ed. 2001 pg. 293).  This can be when the maker of drawer of a negotiable instrument, such as a promissory note or check, is induced to sign the instrument without a reasonable opportunity to learn of its fraudulent character or essential terms.  Determination of whether an act constitutes fraud in the factum depends upon consideration of "all relevant factors."  Fraud in the factum usually voids the instrument under state law and is a real defense against even an holder in due course.**

**Other State/Common Law Claims-See Below**                                                         *Possible*

<u>Breach of Contract</u>

**Need to evaluate entire mortgage-servicing history for breach of contract – QWR RECOMMENDATION.**

## Breach of Implied Covenant of Good Faith and Fair Dealing

The law provides that in every contract, there is an implied duty of good faith and fair dealing between the parties. This implied covenant imposes the requirement "that neither party will do anything, which will injure the right of the other to receive the benefits of the agreement."

## Breach of Fiduciary Duty

In certain situations, courts have implicitly recognized imposing fiduciary duties on lenders based on policy grounds.  For instance, a lender may be considered a fiduciary when it "takes control" of the borrower, or when "moral, social, personal, or domestic" relationships are shown to exist between the parties.  (Cases cited in American Bar Association – Business Tort Litigation (2nd Ed.)  Further, when the lender undertakes to perform a task on behalf of the borrower, then it is likely that the lender has made itself a fiduciary for the borrower, based on the law of agency.
Often times, when a loan officer or mortgage broker is helping to arrange a loan for a borrower, that loan officer/mortgage broker is, in reality, acting as the agent for both the lender and borrower.

The fiduciary duty of the lender is a responsibility to perform their own diligence to determine if a customer is being placed in a loan that is legal, properly disclosed, is the best loan for the consumer given their financial circumstance and affordable over the life of the loan if present financial positions hold steady.  If the <u>lender knew or should have known that the Borrower has a likelihood of defaulting on this loan, he/she has a fiduciary duty to the borrower to not place them in that loan (in harm's way).</u>

When a loan transaction occurs, any missteps in the loan transaction process can lead to dire consequences for the borrower.  It is for this reason that the law should impose more liberally a fiduciary relationship between borrower and lender, especially in the residential home loan marketplace where the average borrower is not as sophisticated as the lender.  If fiduciary relationships were more liberally imposed, we would likely see lenders implementing more safeguards before underwriting a loan.

If the lender is aware that the borrowers would be better off with another type of loan that the lender offers, they have violated their duty to the consumers and such act of deception would be likely be considered fraud on the consumer and predatory.

➢   Brokers owe a fiduciary duty to borrowers.

➢   Liability potential for lender may exist if borrower can prove either that: (1) a "special relationship or circumstance" existed, (2) the lender "directly ordered, authorized or participated in" the broker's tortuous conduct, or (3) that broker acted as lender's agent for the transaction.

## Unjust Enrichment

Unjust enrichment is a general equitable principle that no person should be allowed to profit at another's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained.  The elements to prove this claim are threefold.  First, the plaintiff must have provided the defendant with something of value while expecting compensation in return.  Second, the defendant must have acknowledged, accepted, and benefited from whatever the plaintiff provided.  Third, the plaintiff must show that it would be inequitable or unconscionable for the defendant to enjoy the benefit of the plaintiff's actions without paying for it.

## Unconscionability

The court has the power to refuse to enforce a contract or a clause in a contract that is unconscionable when made.

The common law contract defense of unconscionability could be applied to stop a foreclosure when either the mortgage terms are unreasonably favorable to the lender or certain aspects of the transaction render it unconscionable.[2]

---

[2]*In re Maxwell,* 281 B.R. 101 (banker. D. Mass. 2002); Hager *v. American Gen. Fin. Inc.,* 37 F.Supp.2d 778 (1999).  For example, a Connecticut court found a second mortgage contract to be unconscionable based on the facts that:

<u>Civil Conspiracy</u>

A civil conspiracy of collusion is an agreement between two or more parties to deprive a third party of legal rights or deceive a third party to obtain an illegal objective.

## **OTHER CLAIMS & RECOMMENDED LEGAL RESEARCH**
**Note: Federal laws may preempt certain state claims**

### **Fair Debt Collection Practices Act (Fed. & State)**

The FDCPA, 15 U.S.C. § 1692 et seq., a United States statute added in 1978 as Title VIII of the Consumer Credit Protection Act, broadly defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  The Act prohibits certain types of "abusive and deceptive" conduct when attempting to collect debts.

### **UCC Provisions**

UCC 3-309.  ENFORCEMENT OF LOST, DESTROYED, OR STOLEN INSTRUMENT. 9. ENFORCEMENT OF LOST, DESTROYED, OR STOLEN INSTRUMENT.

    (a) A person not in possession of an instrument is entitled to enforce the instrument if (I) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

    (b) A person seeking enforcement of an instrument under subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument.

§ 3-301.  PERSON ENTITLED TO ENFORCE INSTRUMENT.

    "Person entitled to enforce" an instrument means (I) the holder of the instrument, (ii) a non-holder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 3-

309 or 3-418(d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

- The defendant had limited knowledge of English, was uneducated and did not read very well;
- The defendant's financial situation made it apparent she could not reasonably expect to repay the mortgage;
- At the closing, the defendant was not represented by an attorney and was rushed by plaintiff's attorney to sign the loan document;
- The defendant was not informed until the last minute that, as a condition of credit, she was required to pay one year's interest in advance and there was an absence of meaningful choice on the part of the defendant; and
- In addition, the court found that the contract was substantively unconscionable, because it contained a large balloon payment that the borrower had no means of paying, and that the borrower had no reasonable opportunity to understand the terms of the contract. *Family Fin. Servc. V. Pencer*, 677 A.2d 479, (Conn. Ct. App. 1996); and *Emigrant Mortg., Co., Inc., v. D'Angostino*, 896 A.2d 814 (Conn. Ap. Ct. 2006).

## 2. HOLDER IN DUE COURSE

(a) Subject to subsection (c) and Section 3-106(d), "holder in due course" means the holder of an instrument if:

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 3-306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 3-305(a).

## § 3-305. DEFENSES AND CLAIMS OF RECOUPMENT.

(a) Except as otherwise provided in this section, the right to enforce the obligation of a party to pay an instrument is subject to the following:

(1) a defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;

(b) Except as stated in subsection (d), in an action to enforce the obligation of a party to pay the instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment, or claim to the instrument (Section 3-306) of another person, but the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument. An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of a holder in due course and the obligor proves that the instrument is a lost or stolen instrument.

## § 3-305. TRANSFER OF INSTRUMENT: RIGHTS ACQUIRED BY TRANSFER

(c) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a

transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

Case Law

*Pacific Concrete F.C.U. V.Kauanoe,* 62 Haw. 334,614 P.2d936 (1980),

*GE Capital Hawaii, Inc. v. Yonenaka,* 25 P.3d 807, 96 Hawaii 32, (Hawaii App 2001),

*Fooks v. Norwich Housing Authority,* 28 Conn. L. Rptr. 371, (Conn. Super.2000), and *Town of Brookfield v. Candlewood Shores Estates, Inc.* 513 A.2d 1218, 201 Conn. (1986).

*Solon v. Godbole,* 163 Ill. App. 3d 845, 114 Ill. Dec. 890, 516 N. E.2d 1045 (3Dist. 1987).

*Staff Mortgage. & Inv. Corp.,* 550 F.2d 1228 (9th Cir 1977). "Under the Uniform Commercial Code, the only notice sufficient to inform all interested parties that a security interest in instruments has been perfected is actual possession by the secured party, his agent or bailee.

ARTICLE 3
PREDATORY LENDING DATABASE

(Source: P.A. 94-280, eff. 1-1-06)

(765 ILCS 77/70)
Sec. 70. Predatory lending database program.
(a)   As used in this article.
"Adjustable rate mortgage" or "ARM" means a closed-end mortgage transaction That allows adjustments of the loan interest rate during the first 3 years of the loan term.
"Borrower" means a person seeking a mortgage loan.
"Broker" means a "broker" or "loan broker", as defined in subsection (p) of Section 1-4 of the Residential Mortgage License Act of 1987.
"Closing agent" means an individual assigned by a title insurance company or a broker or originator to ensure that the execution of documents related to the closing of a real estate sale or the refinancing of a real estate loan and the disbursement of closing funds are in conformity with the instructions of the entity financing the transaction.
"Counseling" means in-person counseling provided by a counselor employed by a HUD-certified counseling agency to all borrowers, or documented telephone counseling where a hardship would be imposed on one or more borrowers. A hardship shall exist in instances in which the borrower is confined to his or her home due to medical conditions, as verified in writing by a physician, or the borrower resides 50 miles or more from the nearest HUD-certified housing counseling agency. In instances of telephone counseling, the borrower must supply all necessary documents to the counselor at least 72 hours prior to the scheduled telephone counseling session.
"Counselor" means a counselor employed by a HUD-certified housing counseling agency.
"Credit Score" means a credit risk score as defined by the Fair Isaac Corporation

22

or its successor, and reported under such names as "BEACON", "EMPIRICA", and "FAIR ISAAC RISK SCORE" by one or more of the following credit reporting agencies or their successors: Equifax, Inc., Experian Information Solutions, Inc., and TransUnion LLC. If the borrower's credit report contains credit scores from 3 reporting agencies, then the broker or loan originator shall report the middle score.

"Department" means the Department of Financial and Professional Regulation.

"Exempt Person" means that term as it is defined in subsections (d)(1) and (d)(1.5)

"First-time homebuyer" means a borrower who has not held an ownership interest in residential property.

"HUD-certified counseling" or "counseling" means counseling given go a borrower by a counselor employed by a HUD-certified housing counseling agency.

"Interest only" means a closed-end loan that permits one or more payments of interest without any reduction of the principal balance of the loan, other than the first payment on the loan.

"Lender" means that term as it is defined in subsection (g) of Section 1-4 of the Residential Mortgage License Act of 1987.

"Licensee" means that term as it is defined in subsection (e) of Section 1-4 of the Residential Mortgage License Act of 1987.

of the Residential Mortgage License Act of 1987.

"Negative amortization" means an amortization method under which the outstanding balance may increase at any time over the course of the loan because the regular periodic payment does not cover the full amount of interest due.

"Originator" means a "loan originator" as defined in subsection (hh) of Section 1-4 of the Residential Mortgage License Act of 1987, except an exempt person.

"Points and fees" has the meaning ascribed to that term in Section 10 of the High Risk Home Loan Act.

"Prepayment penalty" means a charge imposed by a lender under a mortgage note or rider when the loan is paid before the expiration of the term of the loan.

"Refinancing" means a loan secured by the borrower's or borrower's primary residence where the proceeds are not used as purchase money for the residence.

"Title insurance company" means any domestic company organized under the laws of this State for the purpose of conducting the business of guaranteeing or insuring title to real estate and any title insurance company organized under the laws of another State, the District of Columbia, or a foreign government and organized to transact the business of guaranteeing or insuring title to real estate in this State.

(a-5) A predatory lending database program shall be established within Cook County. The program shall be administered in accordance with this Article. The inception date of the program shall be July 1, 2008. A predatory lending database shall be expanded to include Kane, Peoria, and Will counties. The inception date of the expansion of the program shall be Juy2, 2010. Until the inception date, none of the duties, obligations, contingencies, or consequences of or from the program shall be imposed. The program shall apply to all mortgage applications that are governed by this Article and that are made or taken on or after the inception of the program.

(b) The database created under this program shall be maintained and administered by the Department. The database shall be designed to allow brokers, originators, counselors, title insurance companies, and closing agents to submit information to the database online. The database shall not be designed to allow those entities to retrieve information from the database, except as otherwise provided in this Article. Information submitted by the broker or originator to the Department may be used to populate the online form submitted by a counselor, title insurance company, or closing agent.

(c) Within 10 days after taking a mortgage application, the broker or originator for any mortgage on residential property within the program area must submit to the predatory lending database all of the information required under Section 72 and any other information required by the Department by rule. Within 7 days after

23

receipt of the information, the Department shall compare that information to the
housing counseling standards in Section 73 and issue to the borrower and the
broker or originator a determination of whether counseling is recommended for
the borrower.  The borrower may not waive counseling.  If at any time after
submitting the information required unde4r Section 72 and, within 4 days after
receipt of the information re-submitted by the broker or originator, the
Department shall compare that information to the housing counseling standards
in Section 73 and shall issue to the borrower and the broker or originator a new
determination of whether re-counseling for the borrower is recommended for
the borrower based on the information re-submitted by the broker or originator.
The Department shall require re-counseling if the loan terms have been modified
to meet another counseling standard in Section 73, or if the broker has increased
the interest rate by more than 200 basis points.

(d) If the Department recommends counseling for the borrower under
subsection (c), then the Department shall notify the borrower of all participating
HUD-certified counseling agencies located within the State and direct the
borrower to interview with a counselor associated with one of those agencies.
Within 10 days after receipt of the notice of HUD-certified counseling agencies,
the borrower shall select one of those agencies and shall engage in an interview
with a counselor associated with that agency.  Within 7 days after interviewing
the borrower, the counselor must submit to the predatory lending database
all of the information required under Section 74 and any other information
required by the Department by rule.  Reasonable and customary costs not
to exceed $300 associated with counseling provided under the program shall
be paid by the broker or originator.  The department shall annually calculate to
the nearest dollar an adjusted rate for inflation.  A counselor shall not recommend
or suggest that a borrower contact any specific mortgage origination company,
financial institution, or entity that deals in mortgage finance to obtain a loan,
another quote, or for any other reason related to the specific mortgage transaction;
however, a counselor may suggest that the borrower seek an opinion or a quote
from another mortgage origination company, financial institution, or entity that
deals in mortgage finance.  A counselor or housing counseling agency that in good
faith provides counseling shall not be liable to a broker or originator or
borrower for civil damages, except for willful or wanton misconduct on the part
of the counselor in providing the counseling.

(e) The broker or originator and the borrower may not take any legally
binding action concerning the loan transaction until the later of the following:
(1) the Department issues a determination not to recommend HUD-certified
counseling for the borrower in accordance with subsection (c); or
(2) the Department issues a determination that HUD-certified counseling is
recommended for the borrower and the counselor submits all required
information to the data base accordance with subsection (d).

(f) Within 10 days after closing the tile insurance company or closing agent
must submit to the predatory lending database all of the information
required under Section 76 and any other information required by the
Department by the rule.

(g) The title insurance company or closing agent shall attach to the mortgage
a certificate of compliance with the requirements of this Article, as generated
the certificate of compliance, then the mortgage is not recordable.  In addition,
if any lis pendens for a residential mortgage foreclosure is recorded on the
property within the program are, a certificate of service must be simultaneously
recorded that affirms that a copy of the lis pendens was filed with the
Department.  If the certificate of service is not recorded, then the lis pendens
pertaining to the residential mortgage foreclosure in question is not recordable
and is of no force and effect.

(h) All information provided to the predatory lending database under the
program is confidential and is not subject to disclosure under the Freedom
of Information Act, except as otherwise provided in this Article.  Information

24

or documents obtained by employees of the Department in the course of maintaining and administering the predatory lending database are deemed confidential. Employees are prohibited from making disclosure of such confidential information or documents. Any request for production of information from the predatory lending database, whether by subpoena, notice, or any other source, shall be referred to the Department of Financial and Professional Regulation. Any borrower may authorize in writing the release of database information. The Department may use the information in the database without consent of the borrower: (i) for the purposes of administering and enforcing the program; (ii) to provide relevant information to a counselor providing counseling to a borrower under the program; or (iii) to the appropriate law enforcement agency or the applicable administrative agency if the database information demonstrates criminal, fraudulent, or otherwise illegal activity.

  (i) Nothing in this Article is intended to prevent a borrower from making his or her own decision as to whether to proceed with a transaction.

  (j) Any person who violates any provision of this Article commits an unlawful practice within the meaning of the Consumer Fraud and Deceptive Business Practices Act.

  (k) During the existence of the program, the Department shall submit semi-annual reports to the Governor and to the General Assembly by May 1 and November 1 of each year detailing its findings regarding the program. The report shall include, by county, at least the following information for each reporting period:

>        (1) the number of loans registered with the program;
>        (2) the number of borrowers receiving counseling;
>        (3) the number of loans closed;
>        (4) the number of loans requiring counseling for each of the standards set forth in Section 73;
>        (5) the number of loans requiring counseling where the mortgage originator changed the loan terms subsequent to counseling;
>        (6) the number of licensed mortgage brokers and loan originators entering information into the database;
>        (7) the number of investigations based on information obtained from the database, including the number of licensees fined, the number of licenses suspended, and the number of licenses revoked;
>        (8) a summary of the types of non-traditional mortgage products being offered; and
>        (9) a summary of how the Department is actively utilizing the program to combat mortgage fraud.

(Source: P.A. 95-69, eff. 6-1-08; 96-328, eff. 8-11-09, 96-856, eff. 12-31-09)

  (765 ILCS 77/72)
  Sec. 72. Originator; required information. As part of the predatory lending database program, the broke4r or originator must submit all of the following information for inclusion in the predatory lending database for each loan for which the originator takes an application.

>        (1) The borrower's name, address, social security number or taxpayer identification number, date of birth, and income and expense information contained in the mortgage application.
>        (2) The address, permanent index number, and a description of the collateral and information about the loan or loans being applied for and the loan terms, including the amount of the loan, the rate and whether the rate is fixed or adjustable, amortization or loan period terms, and any other material terms.

(3) The borrower's credit score at the time of application.

(4) Information about the originator and the company the originator works for, including the originator's license number and address, fees being charged, whether the fees are being charged as points up front, the yield spread premium payable outside closing, and other charges made or remuneration required by the broker or originator or its affiliates or the broker's or originator's employer or its affiliates for the mortgage loans.

(5) Information about affiliated or third party service providers, including closing agents, attorneys, and realtors who are involved with the transaction and the broker originator and any moneys received from the broker or originator in connection with the transaction.

(6) All information indicated on the Good Faith Estimate and Truth in Lending statement disclosures given to the borrower by the broker or originator.

(7) Annual real estate taxes for the property, together with any assessments payable in connection with the property to be secured by the collateral and the proposed monthly principal and interest charge of all loans to be taken by the borrower and secured by the property of the borrower.

(8) Information concerning how the broker or originator obtained the client and the name of its referral source, if any.

(9) Information concerning the notices provided by the broker or originator to the borrower as required by law and the date those notices were given.

(10) Information concerning whether a sale and leaseback is contemplated and the names of the lessor and lessee, seller, and purchaser.

(11) Any and all financing by the borrower for the subject property within 12 months prior to the date of application.

(12) Loan information, including interest rate, term, purchase price, down payment, and closing costs.

(13) Whether the buyer is a first-time homebuyer or refinancing a primary residence.

(14) Whether the loan permits interest only payments.

(15) Whether the loan may result in negative amortization.

(16) Whether the total points and fees payable by the borrowers at or before closing will exceed 5%.

(17) Whether the loan includes a prepayment penalty, and, if so, the terms of the penalty.

(18) Whether the loan is an ARM.

(Source: P.A. 94-280, eff. 1-1-06; 95-691, eff. 6-1-08)

(765 ILCS 77/73)

Sec. 73. Standards for counseling.  A borrower or borrowers subject to this Article shall be recommended for counseling if, after reviewing the information in the predatory lending database submitted under Section 72, the Department finds the borrower or borrowers are all first-time homebuyers or refinancing a primary residence4 and the loan is a mortgage that includes one or more of the following.

(1) the loan permits interest only payments;

(2) the loan may result in negative amortization;

(3) the total points and fees payable by the borrower at or before closing will exceed 5%;

(4) the loan includes a prepayment penalty; or

(5) the loan is an ARM.

(Source: P.A. 95-691, eff. 6-1-08)

26

(765 ILCS 77/74)

Sec. 74 Counselor; required information.  As part of the predatory lending database program, a counselor must submit all of the following information for inclusion in the predatory lending database:

    (1) The information called for in items (1), (6), (9), (11), (12), (13), (14), (15, (16), (17), and (18) of Section 72.

    (2) Any information from the borrower that confirms or contradicts the information called for under item (1) of the Section.

    (3) The name of the counselor and address of the HUD-certified housing counseling agency that employs the counselor.

    (4) Information pertaining to the borrower's monthly expenses that assists the counselor in determining whether the borrower can afford the loans or loan for which the borrower is applying.

    (5) A list of the disclosures furnished to the borrower as seen and reviewed by the counselor, and a comparison of that list to all disclosures required by law.

    (6) Whether the borrower provided tax returns to the broker or originator or to the counselor, and, if so, who prepared the tax returns.

    (7) A statement of recommendations of the counselor that indicates the counselor's response to each of the following statements:

        (A) The loan should not be approved due to indicia of fraud.

        (B) The loan should be approved; no material problems noted.

        (C) The borrower cannot afford the loan.

        (D) The borrower does not understand the transaction.

        (E) The borrower does not understand the costs associated with the transaction.

        (F) The borrower's monthly income and expenses have been Reviewed and disclosed.

        (G) The rate of the loan is above market rate.

        (H) The borrower should seek a competitive bid from another broker or originator.

        (I) There are discrepancies between the borrower's verbal understanding and the originator's completed form.

        (J) The borrower is precipitously close to not being able to afford the loan.

        (K) The borrower understands the true cost of debt consolidation and the need for credit card discipline.

        (L) The information that the borrower provided the originator has been amended by the originator.

(Source: P.A. 94-280, eff. 1-1-06; 95-691, eff. 6-1-08.)

(765 ILCS 77/76)

Sec. 76. Title insurance company or closing agent; required information.  As part of the predatory lending database pilot program, a title insurance company or closing agent must submit all of the following information for inclusion in the predatory lending database.

    (1) The borrower's name, address, social security number or taxpayer identification number, date of birth, and income and expense information contained in the mortgage application.

    (2) The address, permanent index number, and a description of the collateral and information about the loan or loans being applied for and the loan terms, including the amount of the loan, the rate and whether the rate is fixed or adjustable, amortization or loan period terms, and any other material terms.

    (3) Annual real estate taxes for the property, together with any assessments payable in connection with the property to be secured by the collateral and the proposed monthly principal and interest and interest charge

27

of all loans to be taken by the borrower and secured by the property of the borrower as well as any required escrows and the amounts paid monthly for those escrows.

(4) All itemizations and descriptions set forth in the RESPA settlement statement including items to be disbursed, payable outside closing "POC" items noted on the statement, and a list of payees and the amounts of their checks.

(5) The name and license number of the title insurance company or closing agent together with the name of the agent actually conducting the closing.

(6) The names and addresses of all originators, brokers, appraisers, sales Persons, attorneys, and surveyors that are present at the closing.

(7) The date of closing, a detailed list of all notices provided to the borrower at closing and the date of those notices, and all information indicated on the Truth in Lending statement and Good Faith Estimate disclosures.

(Source: P.A. 94-280, eff. 1-1-06.)


(765 ILCS 77/78)
Sec. 78. Exemption.  Borrowers applying for reverse mortgage financing of residential real estate including under programs regulated by the Federal Housing Authority (FHA) require HUD-certified counseling are exempt from the program and may submit a HUD counseling certificate to comply with the program.
(Source: P.A. 95-691, eff. 6-1-08.)


(765 ILCS 77/80)
Sec. 80. Predatory Lending Database Program Fund.  The Predatory Lending Database Program Fund is created as a special fund in the State treasury.  Subject to appropriation, moneys in the Fund shall be appropriated to the Illinois Housing Development Authority for the purpose of making grants for HUD-certified counseling agencies participating in the Predatory Lending Database Program to assist with implementation and development of the Predatory Lending Database Program.
(Source: P.A. 95-707, eff. 1-11-08.)


(765 ILCS 77/Art. 4 heading)
ARTICLE 4
EFFECTIVE DATE
(Source: P.A. 94-280, eff. 1-1-06.)


(765 ILCS 77/99)
Sec. 99. This Act take effect on October 1, 1994.
(Source: P.A. 88-111.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT "B"

25
26
27
28
29

WORLD SAVINGS BANK, FSB )
                Plaintiff )   Case No
                                           )   AFFIDAVIT OF LAURA MATHEWS
                Vs     )
          Defendant, )
RENE L. LARSON )

---

I, Laura Mathews, of legal age and competent to testify, state as follows based on my own personal knowledge understanding and belief and make this Affidavit/ Declaration based on personal knowledge and state as follows under the penalties of perjury under the laws of the People of the state of Washington:

1. I Laura Mathews am a Certified Forensic Loan Auditor Certified with the National Association of Mortgage Underwriters.

2. I certify that on October 25, 2010 I completed a Securitization audit on the property located at 532 E. Stone Creek Dr., La Center, WA 98629, Loan # 00242292429.

3. Said Securitization is listed in my report entitled Research Memorandum dated 10/25/2010.

4. Said Securitization Audit tracks the historical assignment into Mortgage Backed Asset Certificate Series.

5. The provided Notice of Trustee Sales refers to the subject property and to a Deed of Trust dated **2/19/2004**, recorded **2/25/2004** under Auditor's file No. **3792519**, records of **Clark County, Washington**. The Notice of Trustee Sale names Grantor **"Rene L. Larson a Married Woman" First American title Insurance Company, A California Corporation** as Trustee, in favor of **World Savings Bank, FSB** It's Successors and/or Assignees, as Beneficiary, the beneficial interest in which is presently held by **WELLS FARGO BANK, NA SUCCESSOR BY MERGER TO WELLS FARGO BANK SOUTHWEST, NA FORMERLY KNOWN AS WACHOVIA MORTGAGE, FSB, FORMERLY KNOWN AS WORLD SAVINGS BANK, FSB.**

6. **Wells Fargo Mortgage Asset-Backed Pass -Through Certificates, Series 2005-2** has a cut-off date of October 8, 2005, after the subject loan's origination date of February 19, 2004.

7. I verify and attest that the most likely candidate for said loan is the Asset-Backed Security Fund Wells Fargo Mortgage Asset-Backed Pass -Through Certificates, Series 2005-2.

Made this _25th_ day of _October_, _2010_.

Laura Mathews

_Laura Mathews_

Certified Forensic Loan Auditor

PO Box 99700

Lakewood, WA 98496

## Notary Statement

State of Washington }
} ss
County of King }

**BE IT REMEMBERED,** that on the _25th_ day of _October_ 2010, before me, the undersigned, a Notary Public in and for the state of Washington, personally appeared, Laura Mathews who proved to me to be the same individual who executed the within instrument, and, affirmed that she is personally fully aware of the contents and accuracy of the statements made therein, and affirms that the document is, to the very best of her knowledge, true and correct.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and affixed My Official seal the day and year last above written.

_DJ Wilson_

Notary Public for _Washington_

Commission Expires on _7/10/12_

Page 3 of 3

Equitas Solutions Inc.
PO Box 99700
Lakewood, WA 98496



---

RESEARCH MEMORANDUM
10/25/2010

Re: Rene L. Larson
    532 East Stonecreek Dr.
    La Center, WA 98629

## 1st Trust Deed and Loan:

| | |
|---|---|
| Loan No.: | 0024229429 |
| Loan Amount: | $206,250.00 |
| Loan Type: | Adjustable Rate Mortgage Note Pick-A-Payment Loan, 12 Month Option Arm 125% NEG-AM |
| Settlement Date: | February 19, 2004 |
| Maturity Date: | March 15, 2034 |

## 1st TD INVESTMENT VEHICLE(S):

## Wells Fargo Mortgage Asset-Backed Pass -Through Certificates, Series 2005-2

## PRELIMINARY STATEMENT

Research of the Report consisted of searching SEC filings for indicators that the subject loan was securitized in a public investment vehicle. Mortgage loan trusts or REMICs 1) created shortly after the subject loan's origination and 2) including loans with interest rates based on the same index are candidate investment vehicles. This Report names the most likely one or two candidate vehicles. A loan may be included in a privately held investment vehicle. In particular, if the reported vehicle has been de-registered (with a Form 15-15D filing) it may still exist as a privately held vehicle. Private entities generally do not submit SEC filings so are not captured by this research.

1

## FACTS AND DISCUSSION

| Mortgage Broker | Mortgage Servicer | Mortgage Nominee/Beneficiary |
|---|---|---|
| **ALL FUND MORTGAGE 833 PACIFIC AVE STE. G TACOMA, WA 98444** | **WELLS FARGO BANK** | **WORLD SAVINGS BANK, FSB IT'S SUCCESSORS AND/OR ASSIGNS** |
| Original Mortgage Lender/Table Funder | Mortgage Trustee | Title Company |
| **WORLD SAVINGS BANK FSB 1901 HARRISON ST. OAKLAND, CA. 94612** | **FIRST AMERICAN TITLE COMPANY A CALIFORNIA CORPORATION** | **FIRST AMERICAN TITLE COMPANY 2103 NE 129TH ST. #100 VANCOUVER, WA 98686** |

The provided Notice of Trustee Sales refers to the subject property and to a Deed of Trust dated **2/19/2004**, recorded **2/25/2004** under Auditor's file No. **3792519**, records of **Clark** County, **Washington**. The Notice of Trustee Sale names Grantor "**Rene L. Larson a Married Woman" First American title Insurance Company, A California Corporation** as Trustee, in favor of **World Savings Bank, FSB** It's Successors and/or Assignees, as Beneficiary, the beneficial interest in which is presently held by **WELLS FARGO BANK, NA SUCCESSOR BY MERGER TO WELLS FARGO BANK SOUTHWEST, NA FORMERLY KNOWN AS WACHOVIA MORTGAGE, FSB, FORMERLY KNOWN AS WORLD SAVINGS BANK, FSB.**

## RESEARCH BASES AND ATTACHMENTS

**Wells Fargo Mortgage Asset-Backed Pass -Through Certificates, Series 2005-2** has a cut-off date of October 8, 2005, after the subject loan's origination date of February 19, 2004.

**Securities and Exchange Commission Filings:**
Wells Fargo Mortgage Asset-Backed Pass -Through Certificates, Series 2005-2 CIK#:
0001342885

http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001342885&owner=exclude&count=40

10-K  Documents Annual report [Section 13 and 15(d), not S-K Item 405]
Acc-no: 0001056404-06-001186 (34 Act)  Size: 19 KB 2006-03-24 333-109423-02
06708343 15-15D  Documents Suspension of duty to report [Section 13 and 15(d)]
Acc-no: 0001056404-06-000913 (34 Act)  Size: 4 KB 2006-01-27 333-109423-02
06557621 8-K  Documents Current report, items 8.01 and 9.01
Acc-no: 0001056404-06-000265 (34 Act)  Size: 46 KB 2006-01-05 333-109423-02
06511675 8-K  Documents Current report, items 8.01 and 9.01
Acc-no: 0001056404-05-004120 (34 Act)  Size: 43 KB 2005-12-02 333-109423-02
051239579 8-K  Documents Current report, items 8.01 and 9.01

2

Acc-no: 0000914121-05-002218 (34 Act)  Size: 944 KB 2005-11-25 <u>333-109423-02</u>
051226347 424B5  <u>Documents</u> Prospectus [Rule 424(b)(5)]
Acc-no: 0001193125-05-210943 (33 Act)  Size: 2 MB 2005-10-28 <u>333-109423-02</u>
051162934

## <u>424B5</u>

<u>http://www.sec.gov/Archives/edgar/data/1011663/000119312505210943/d424b5.htm</u>

Wells Fargo Alternative Loan 2005-2 Trust
Issuer

# Wells Fargo Asset Securities Corporation

Seller

$342,059,200
(Approximate)
Mortgage Asset-Backed Pass-Through Certificates, Series 2005-2

**RELEVANT PARTIES**

**Issuer**

Wells Fargo Alternative Loan 2005-2 Trust.

**Seller**

Wells Fargo Asset Securities Corporation.

**Master Servicer**

Wells Fargo Bank, N.A.

**Servicers**

Initially, Wells Fargo Bank, N.A. Any other servicer will be approved by the master servicer.

**Trustee**

Wachovia Bank, National Association.

**Custodian**

Wells Fargo Bank, N.A.

**Cap Provider**

Goldman Sachs Capital Markets L.P.

## <u>8-K</u>

3

http://www.sec.gov/Archives/edgar/data/1342885/000091412105002218/we870645-8k.txt

On October 28, 2005, Wells Fargo Asset Securities Corporation, a
Delaware corporation (the "Registrant"), sold Mortgage Asset-Backed
Pass-Through
Certificates, Series 2005-2, Class A-1, Class A-2, Class A-3, Class A-
4, Class
A-5, Class R-1, Class R-2, Class M-1, Class M-2, Class M-3, Class M-4,
Class
M-5, Class B-1 and Class B-2 (the "Offered Certificates"), having an
aggregate
original principal balance of $342,059,200. The Offered Certificates
were issued
pursuant to a Pooling and Servicing Agreement, dated as of October 28,
2005,
among the Registrant, Wells Fargo Bank, N.A., as master servicer (the
"Master
Servicer") and Wachovia Bank, National Association, as trustee (the
"Agreement"), a copy of which is filed as an exhibit hereto. Mortgage
Asset-Backed Pass-Through Certificates, Series 2005-2, Class B-3, Class
CE and
Class P Certificates (the "Private Certificates" and, together with the
Offered
Certificates, the "Certificates"), having an aggregate initial
principal balance
of $1,724,000, were also issued pursuant to the Agreement.


## POOLING AND SERVICE AGREEMENT

http://www.sec.gov/Archives/edgar/data/1342885/000091412105002218/we870645-ex4.txt

WELLS FARGO ASSET SECURITIES CORPORATION

(Seller)

and

WELLS FARGO BANK, N.A.

(Master Servicer)

and

WACHOVIA BANK, NATIONAL ASSOCIATION

(Trustee)

POOLING AND SERVICING AGREEMENT

Dated as of October 28, 2005

Mortgage Asset-Backed Pass-Through Certificates
Series 2005-2

4

## **CONCLUSION**

**Wachovia** is a diversified, wholly owned financial services owned by Wells Fargo based in Charlotte, North Carolina. As an independent company, it was the fourth-largest bank holding company in the United States based on total assets.

The purchase of Wachovia Corporation by Wells Fargo was completed on December 31, 2008. Wells Fargo bought over Wachovia after a government-forced sale to avoid a failure of Wachovia.

Wachovia agreed to purchase Golden West Financial for a little under $25.5 billion on May 7, 2006. This acquisition gave Wachovia an additional 285-branch network spanning 10 states. Wachovia greatly raised its profile in California, where Golden West held $32 billion in deposits and operated 123 branches.

Golden West, which operated branches under the name World Savings Bank, was the second largest savings and loan in the United States. The business was a small savings and loan in the San Francisco Bay area when it was purchased in 1963 for $4 million by Herbert and Marion Sandler. **Golden West specialized in option ARMs loans, marketed under the name "Pick-A-Pay."** These loans gave the borrower a choice of payment plans, including the option to defer paying a part of the interest owed, which was then added onto the balance of the loan.

I have searched the Securities and Exchange Commission database and I am unable to locate any filings for World Savings Bank, FSB. I was able to locate the first Pooling and Service agreement between Wells Fargo Bank and Wachovia Bank and have attached the web links to the Prospectus, 8-K filing and Pooling and Service agreement dated October 28, 2005.

---

[1] **Form 10-K** is an annual report which provides a comprehensive overview of the company for the past year. The filing is due 90 days after the close of the company's fiscal year, and contains such information as company history, organization, nature of business, equity, holdings, earnings per share, subsidiaries, and other pertinent financial information.

[2] **Form 424B5** is a form of Prospectus that discloses information in the forms **424B2** and **424B3**. **Form 424B2** is a form of Prospectus filed in connection with a primary offering of securities on a delayed basis which includes the public offering price, description of securities and specific method of distribution. **Form 424B3** is a form of Prospectus that reflects facts or events that constitute a substantive change from or in addition to the information set forth in the last form of prospectus filed with the SEC.

[3] **Form 15-15D** is a certification of termination of registration of a class of security under §12(g), or notice of suspension of duty to file reports pursuant to §13 and §15(d) of the Securities Exchange Act. §13 and §15(d) initial filing.

[4] **Form 8-K** is the current report companies must file with the SEC to announce major events that shareholders should know about.

5



# Certified Forensic Loan Auditor (NAMU®-CFLA)

is hereby granted to

## Laura L. Mathews

to certify that he/she is a member of NAMU® in good standing.

Member #: 1480239
Active Member since: August 3, 2010

_NAMU® Membership Director_

**IMPORTANT LEGAL NOTICE:** NAMU® certifies that you have successfully completed a 32-hour in-person seminar performed by California-Based business-to-business litigation support company Certified Forensic Loan Auditors, LLC. In addition, NAMU® certifies that you have successfully passed a criminal/sex offender background check and agreed to NOT solicit homeowners directly, unless you are a licensed attorney. This 32-hour seminar is strictly intended to provide professional development "how-to" training, and does not imply any State or Federal Government affiliation. Furthermore, this training does not imply nor encourage trainees to offer foreclosure relief/prevention assistance services directly to homeowners, as it is illegal in many states for loan-modification consultants and businesses to charge up-front fees for their services. Additionally, many states now require individuals and businesses offering mortgage-foreclosure consulting, loan-modification and foreclosure-assistance services to post a $100,000 bond. Please note Certified Forensic Loan Auditors, LLC. is exclusively a business-to-business litigation support company, and does NOT work directly with home owners/borrowers in foreclosure. Also, NAMU® is NOT owned or operated by Certified Forensic Loan Auditors, LLC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT "C"

25
26
27
28
29

**NOTICE OF DEFAULT**
*Pursuant to R.C.W. Chapter 61.24, et seq. and 62A.9A-604(a)(2) et seq.*

*Trustee Sale No.: 01-FWA-102753*

|||||||||||| ||| ||||||| |||| |||| ||||| |||| ||||| ||||| |||| ||||| ||||| |||| |||| ||||| ||||| |||| |||| ||||| ||||| |||| |||| |||||| |||

1.    DEFAULT

**YOU ARE HEREBY NOTIFIED** that the Beneficiary has declared you, the borrower or grantor, in default on the obligations secured by a Deed of Trust recorded under Auditor's/Recorder's No. 3792519, records of CLARK County, Washington; originally granted for the benefit of WORLD SAVINGS BANK, FSB, as beneficiary.

The name and address of the owner of the promissory note(s) or other obligation(s) secured by said Deed of Trust Wells Fargo Bank, N.A, c/o WACHOVIA MORTGAGE, FSB, 4101 Wiseman Blvd., Bldg. 203, SAN ANTONIO, TEXAS, 78251. As of the date of this notice, this loan is serviced by WACHOVIA MORTGAGE, FSB, and its address and phone number are: 4101 Wiseman Blvd., Bldg. 203, SAN ANTONIO, TEXAS, 78251, 800.282.3458.

Said Deed of Trust encumbers the following described real property in CLARK County:

> LOT 36, STONECREEK ESTATES, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME "H" OF PLATS, PAGE 868, RECORDS OF CLARK COUNTY, WASHINGTON.

The postal address of the Property is purported to be: 532 EAST STONECREEK DRIVE, LA CENTER, WA 98629.

You should take care to protect your interest in your home. This notice of default (your failure to pay) is the first step in a process that could result in your losing your home. You should carefully review your options. For example:

> Can you pay and stop the foreclosure process?
> Do you dispute the failure to pay?
> Can you sell your property to preserve your equity?
> Are you able to refinance this loan or obligation with a new loan or obligation from another lender with payments, terms, and fees that are more affordable?
> Do you qualify for any government or private homeowner assistance programs?
> Do you know if filing for bankruptcy is an option? What are the pros and cons of doing so?

Do not ignore this notice; because if you do nothing, you could lose your home at a foreclosure sale. (No foreclosure sale can be held any sooner than ninety days after a notice of sale is issued and a notice of sale cannot be issued until thirty days after this notice.) Also, if you do nothing to pay what you owe, be careful of people who claim they can help you. There are many individuals and businesses that watch for the notices of sale in order to unfairly profit as a result of borrower's distress.

You may feel you need help understanding what to do. There are a number of professional resources available, including home loan counselors and attorneys, who may assist you. Many legal services are lower-cost or even free, depending on your ability to pay. If you desire legal help in understanding your options or handling this default, you may obtain a referral (at no charge) by contacting the county bar association in the county where your home is located. These legal referral services also provide information about lower-cost or free legal services for those who qualify. You may contact the Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals.

WA NOD

2.     STATEMENT OF DEFAULT AND ITEMIZED ACCOUNT OF AMOUNTS IN ARREARS:

The beneficiary alleges that you are in default for failure to pay the following past due amounts, which are in arrears:

```
                                                     Amount due as of
                                                     November 16, 2010
                                                     -----------------
       Delinquent Payments from April 15, 2009
       8 payments at $ 1,790.25 each                 $     14,322.00
       12 payments at $ 1,790.05 each                $     21,480.60
            (04-15-09 through 11-16-10)
       Late Charges:                                 $      1,388.90
       Beneficiary Advances:                         $        140.00
       Suspense Credit:                              $          0.00
                                                     ==================
       TOTAL:                                        $     37,331.50
```

If you have failed to pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust, the beneficiary may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums. These requirements for reinstatement should be confirmed by contacting the undersigned Trustee.

3.     OTHER CHARGES, COSTS AND FEES:

In addition to the amounts in arrears specified above, you, the borrower, grantor, or any guarantor, are or may be obligated to pay the following charges, costs and fees to reinstate the Deed of Trust if reinstatement is made before recording of the Notice of Trustee's Sale.

```
       Trustee Fee                               $        405.00
       Certified Mailing Cost                    $         37.50
       Posting Cost                              $         65.00
       TSG Guarantee Policy                      $        574.00
                                                 ==================
       TOTAL CHARGES, COSTS AND FEES:            $      1,081.50
```

4.     REINSTATEMENT:     **IMPORTANT! PLEASE READ!**

THE ESTIMATED AMOUNT NECESSARY TO REINSTATE YOUR NOTE AND DEED OF TRUST BEFORE THE RECORDING OF THE NOTICE OF TRUSTEE'S SALE IS THE SUM OF PARAGRAPHS 2 AND 3 ABOVE IN THE AMOUNT OF $38,527.50, PLUS the amount of any monthly payments and late charges which may fall due after the date of this Notice of Default. However, because some of the items can only be estimated at this time and because the amount needed to reinstate your loan may include presently unknown expenditures required to preserve the property or to comply with state or local laws, it will be necessary for you to contact the undersigned prior to the time you tender funds so that you may be advised of the exact amount you will be required to pay.

WA NOD

Reinstatement monies may be tendered to (CERTIFIED OR CASHIER'S CHECK REQUIRED)

REGIONAL TRUSTEE SERVICES CORPORATION
616 1st Avenue, Suite 500
Seattle, WA 98104

If your default includes a default other than failure to pay monthly payments and/or late charges when due, then in order to reinstate the Note and Deed of Trust before the Notice of Trustee's Sale is recorded, you must cure such other default(s).

5.      CONSEQUENCES OF DEFAULT:

a.      Failure to cure the alleged default within thirty days of the mailing of this notice, or if personally served, within thirty days of the date of personal service thereof, may lead to recordation, transmittal and publication of a Notice of Trustee's Sale, and the Property described in paragraph 1 above may be sold at public auction at a date no less than 120 days in the future.

b.      The effect of the recordation, transmittal and publication of a Notice of Trustee's Sale will be to (i) increase the costs and fees and (ii) publicize the default and advertise the Property described herein for sale.

c.      If the default(s) described above is (are) not cured within thirty days of the mailing of this notice, the lender hereby gives notice that the entire principal balance owing on the note secured by the Deed of Trust described in paragraph 1 above, and all accrued and unpaid interest, as well as costs of foreclosure, shall immediately become due and payable. Notwithstanding acceleration, the grantor or the holder of any junior lien or encumbrance shall have the right after acceleration to reinstate by curing all defaults and paying all costs, fees and advances, if any, made pursuant to the terms of the obligation and/or deed of trust on or before 11 days prior to a Trustee's sale.

d.      The effect of a Trustee's Sale of the grantor's Property by the trustee will be to deprive the grantor of all of their interest in the Property described in paragraph 1 above.

6.      RECOURSE TO COURTS:

The borrower, grantor and any guarantor has recourse to the courts pursuant to RCW 61.24.130 to contest the alleged default on any proper ground.

DATED: 11/16/2010

REGIONAL TRUSTEE SERVICES CORPORATION
Trustee and/or Agent for the Beneficiary

By_____
KAREN JAMES, AUTHORIZED AGENT
616 1st Avenue, Suite 500, Seattle, WA 98104
Telephone: (206) 340-2550

WA NOD

Wachovia Mortgage
P O Box 659558
San Antonio, TX 78265-9558



Loan Number:        )429                          WACHOVIA
Rene L Larson

### Declaration of Wachovia Mortgage

I, _Monica Silva_ an officer of Wachovia Mortgage,
declare as follows:

Regarding Rene L Larson (hereinafter referred to as
"borrower"), Wachovia Mortgage has met the requirement of Revised Code
of Washington Chapter 61.24 as indicated below.

( ) Wachovia Mortgage has contacted the borrower under, and has
    complied with, RCW Section 61.24.150 (contact provision to "assess
    the borrower's financial ability to pay the debt secured by the
    deed of trust and explores options for the borrower to avoid
    foreclosure").

(x) Wachovia Mortgage has exercised due diligence to contact the
    borrower as required under RCW Section 61.24.150 and, after waiting
    fourteen days after the requirements were satisfied, Wachovia
    Mortgage sent to the borrower(s) by certified mail, return receipt
    requested, the letter required under RCW Section 61.24.150.

( ) The borrower surrendered the secured property as evidenced by
    either a letter confirming the surrender or by delivery of the keys
    to the secured property to Wachovia Mortgage.

( ) Under RCW Section 61.24.150, Wachovia Mortgage has verified
    information that, on or before the date of this declaration, the
    borrower(s) has filed for bankruptcy and the bankruptcy stay
    remains in place, or the borrower has filed bankruptcy and the
    bankruptcy court has granted relief from bankruptcy stay allowing
    the enforcement of the deed of trust.

The undersigned authorized the trustee, foreclosure agent and/or their
authorized agent to sign, on behalf of the beneficiary/authorized agent,
the Notice of Default containing the declaration required pursuant to
Revised Code of Washington Section 61.24.150.

I certify (or declare) under penalty of perjury under the laws of the
State of Washington that the foregoing is true and correct.

3/5/10                              _____
Date                               By:
                                   Title: Vice President Loan Documentation

CO842 003 SIL

**NOTICE REQUIRED BY THE**
**FAIR DEBT COLLECTION PRACTICE ACT**
**15 U.S.C. Section 1692**

TS#     01-FWA-102753

11/16/2010

ATTENTION TRUSTORS:

1.  You are hereby notified that REGIONAL TRUSTEE SERVICES CORPORATION is attempting to collect a debt and any information obtained will be used for that purpose.

2.  As of the date of this letter, you owe $241,607.78.  Because of interest, late charges, and other charges that may vary from day to day, or may apply only upon payoff, the amount due on the day you pay may be greater.  Hence if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection.

3.  The original creditor to whom the debt is/was owed is WORLD SAVINGS BANK, FSB.  The current creditor is Wells Fargo Bank, N.A.

4.  The debt will be assumed to be valid by REGIONAL TRUSTEE SERVICES CORPORATION unless WITHIN THIRTY DAYS AFTER THE RECEIPT OF THIS NOTICE, in writing,  you dispute the validity of the debt  or some portion thereof.

5.  If you notify REGIONAL TRUSTEE SERVICES CORPORATION in writing, within thirty days after the receipt of this Notice that the debt or any portion thereof is disputed, REGIONAL TRUSTEE SERVICES CORPORATION will provide a verification of the debt, and a copy of the verification will be mailed to you by REGIONAL TRUSTEE SERVICES CORPORATION.  In attempting to collect the debt, any information obtained will be used for that purpose.

6.  If the current creditor is not the original creditor, and if you make a request to REGIONAL TRUSTEE SERVICES CORPORATION within thirty days after the receipt of this Notice, the name and address of the original creditor will be mailed to you by REGIONAL TRUSTEE SERVICES CORPORATION.

7.  Written and/or verbal requests may be made to and further information can be obtained from:

REGIONAL TRUSTEE SERVICES CORPORATION
616 1st Avenue, Suite 500
Seattle, WA 98104
(206) 340-2550

FDCA Notice

# SERVICEMEMBERS CIVIL  RELIEF ACT NOTIFICATION

If you are on active duty in the armed services, or the dependent of a such a person, and you believe that you are entitled to protections afforded under the Soldiers' and Sailors' Relief Act, please contact the undersigned immediately.  Failure to do so may result in loss of your rights, if any, under the Act.  To facilitate follow-up to any response to this notice, please make any response in writing and describe the circumstances which you believe cause you to be entitled to protection under the Act.

If you have any questions about the applicability of the Soldiers' and Sailors' Relief Act, you should contact a lawyer immediately.  The undersigned is not a lawyer and cannot provide you legal advice.

**REGIONAL TRUSTEE SERVICES CORPORATION**
616 1st Avenue, Suite 500
Seattle, WA 98104
(206) 340-2550

#380095 / SOLDIER AND SAILOR RELIEF ACT / 60000-001